UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAMES CHARLES KOPP,

                Petitioner,                 **No. 08-CV-0572(MAT)**

     -vs-                                   **DECISION AND ORDER**

BRIAN FISCHER, Commissioner,
Department of Correctional Services,
Albany, New York,

                   Respondent.

## I.   Introduction

Represented by counsel Arthur Washburn, Jr., Esq., James Charles Kopp ("Kopp" or "Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his detention in Respondent's custody as the result of a judgment of conviction entered on May 9, 2003, for intentional murder following a bench trial on stipulated facts in Erie County Court (Amico, J.).

## II.  Factual Background and Procedural History

On the evening of October 23, 1998, Petitioner, armed with an SKS semi-automatic rifle, stalked and fatally shot Dr. Barnett Slepian ("Dr. Slepian" or "the victim"), a physician who performed abortions. At the time of the shooting, Dr. Slepian was in the kitchen of his home, with his wife and two of his sons. The bullet struck Dr. Slepian in his back, causing his death.

Aided by two cohorts who shared his militant anti-abortion views, Petitioner fled the country. A massive international manhunt ensued, and Petitioner eventually was apprehended in France by

local law enforcement on March 29, 2001. He was extradited to the United States in June of 2001, where he was charged by an Erie County Grand Jury with intentional murder in the second degree (P.L. § 125.25(1)). On November 11, 2002, *The Buffalo Evening News* published an article in which Petitioner claimed that he did not mean to kill Dr. Slepian, but only meant to injure the doctor so as to prevent him from performing more abortions. The prosecution re-presented the case to the grand jury and obtained a superceding indictment adding a charge of depraved indifference murder in the second degree, pursuant to New York Penal Law ("P.L.") § 125.25(2).

On March 11, 2003, Petitioner elected to forego a jury trial in favor of a stipulated-fact bench trial in which the trial judge sat as the trier-of-fact. The only evidence was contained in a thirty-five page written summary of witness testimony and descriptions of exhibits that would be introduced as evidence. The defense and the prosecution each agreed to the specific contents of this document. Both sides also agreed to that the trier-of-fact would not consider any lesser-included offenses.

After a one-day trial, the judge issued a verdict convicting Petitioner of intentionally murdering Dr. Slepian. Petitioner was sentenced on May 9, 2003, to a term of 25 years to life.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed Petitioner's conviction. <u>People v. Kopp</u>, 33 A.D.3d 153 (App. Div. 4th Dept.

2006). By an order dated September 18, 2006, the New York Court of Appeals denied leave to appeal. People v Kopp, 7 N.Y.3d 849 (N.Y. 2006).   Kopp sought certiorari from the United States Supreme Court, which was denied.

Petitioner filed two unsuccessful motions to vacate the conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, on February 4, 2008, and December 30, 2008, respectively. During the pendency of his post-conviction collateral proceedings, Kopp timely filed the instant habeas petition. All of his grounds for relief appear to have been fully exhausted, see 28 U.S.C. § 2254(b)(1).

For the reasons that follow, the petition is denied.

## III. Standard of Review

It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see generally 28 U.S.C. § 2254(a). When a petitioner "in custody pursuant to the judgment of a State court" seeks habeas review of any federal constitutional claim that was "adjudicated on the merits in State court," a habeas writ may issue only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

## IV.  Analysis of the Petition

### A.   Denial of the Sixth Amendment Right to Counsel

Petitioner contends that he was denied his Sixth Amendment right to the effective assistance of counsel at trial because his attorney operated under an actual conflict of interest due to his concurrent representation of Loretta Marra ("Marra"), an individual charged in federal court with aiding and abetting Petitioner. Although Petitioner waived his attorney's potential conflict of interest during a Gomberg hearing[1] conducted by the trial court, he now claims that the conflict, because it was "actual" rather than "potential", was unwaivable as a matter of law.

In addition, Petitioner faults trial counsel for allegedly having "orchestrated" his "confession" to *The Buffalo Evening News* newspaper and for having induced him, for purely selfish reasons, to forego a jury trial in favor of a stipulated-fact bench trial.

As discussed further below, all of these arguments are without merit.

---

[1]      A Gomberg hearing is a procedure mandated under state law to determine whether an attorney representing two or more co-defendants should continue in the co-representation when the defendants' interests come into conflict. People v. Gomberg, 38 N.Y.2d 307, 313-14 (N.Y. 1975).

1.    **Simultaneous Representation of Petitioner and Marra**

a.    **Overview of the Applicable Legal Principles**

The right to conflict-free representation is inherent in the Sixth Amendment right to counsel. Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000). Thus, a defendant's Sixth Amendment rights may be violated where either (1) the trial court has knowledge of a possible conflict and fails to make inquiries regarding that conflict; (2) there is a per se conflict; (3) there is an actual conflict; or (4) there is a potential conflict. Id. If the trial court fails to inquire into an actual or "per se" conflict, automatic reversal of a conviction is required. Id.

"[C]laims of counsel's conflict of interest that do not qualify as per se or actual are ordinarily treated as 'potential' conflicts." Armienti, 234 F.3d at 824. When a "potential" conflict of interest is implicated, the defendant "must establish both that counsel's conduct fell below an objective standard of reasonableness and that but for this deficient conduct, the result of the trial would have been different, under the familiar standard established by Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." Armienti, 234 F.3d at 824.

An individual who is faced with the possibility that his attorney might become conflicted may waive the potential conflict of interest "in order to retain the attorney of his choice." United States v. Blau, 159 F.3d 68, 74 (2d Cir. 1998) (quoting Williams v.

Meachum, 948 F.2d 863, 866 (2d Cir. 1991)). Such a waiver is valid
where it is both knowing and intelligent. Blau, 159 F.3d at 74
(citing Edwards v. Arizona, 451 U.S. 477, 482 (1981)); see also
United States v. Perez, 325 F.3d 115, 125-28 (2d Cir. 2003).
Whether a defendant's waiver is knowing and intelligent depends on
the circumstances of each individual case, as well as the
background and experience of the accused. Blau, 159 F.3d at 74.

### b.   Background Regarding the Conflict Issue

Kopp originally retained the services of Paul J. Cambria, Jr.,
Esq. ("Cambria"), who intended to present a standard defense in
state court putting the prosecution to its burden of proof. This
strategy conflicted with Kopp's desire to mount an ideological
defense based upon his belief that his slaying of Dr. Slepian was
a morally defensible and correct act and was justified in order to
prevent public harm.

Accordingly, Petitioner sought to replace Cambria with Bruce
Barket, Esq. ("Barket"), an attorney who was sympathetic to
Petitioner's ideology and willing to present his justification
defense at trial. At the time, Barket also was representing Loretta
Marra ("Marra") and Louis Malvasi ("Malvasi"), who both had been
charged under federal law with obstructing justice by harboring
Petitioner while he was a fugitive.

The district court (District Judge Richard J. Arcara, adopting
the Report and Recommendation of Magistrate Judge Hugh B. Scott)

refused to grant Petitioner's request to have Barket represent him in the federal prosecution, holding that Barket's concurrent representation of Petitioner, Marra, and Malvasi created conflicts of interest (both actual and potential) that could not be waived. With regard to the actual conflict, the district court found that Marra was told that a favorable plea deal was "out of the window" if she agreed to have Barket jointly represent her and Kopp. However, Marra then disavowed her previous interest in a plea deal if it meant that she would have to incriminate Kopp.

The district court noted that the possibility of Marra being called, albeit unwillingly, as a witness for the government, created a potential conflict. The fact that Marra might be subjected to additional charges as an accessory-after-the-fact also created a potential conflict if Barket represented both of them. The district court concluded that both Marra and Kopp clearly understood the nature of the conflict and appeared resolute in their desire to waive the conflict. However, the district court concluded, because of the exceedingly complicated and mercurial way in which  the federal proceeding was unfolding, it could not be confident that Kopp or Marra could make a reasonable and knowing waiver.

In addition, the district court found that maintaining the ethical integrity of the Court would be better served by

disqualifying Barket from representing Kopp. Petitioner, denied the right to his preferred counsel, chose to proceed <u>pro</u> <u>se</u>.[2]

### c.   The State Courts' Rulings

Recognizing the need to balance Kopp's right to have effective assistance of counsel with his right to the attorney of his choice, the state trial court conducted an on-the-record inquiry pursuant to <u>People v. Gomberg</u>, 38 N.Y.2d 207, on October 22, 2002, questioning Kopp as to his knowledge about, and the extent of, the potential conflict; and the possible risk to his case were he to waive the conflict. Specifically, the trial court asked Petitioner if he was aware that his attorney also represented Marra; if he was aware that there might be a possible conflict in his case because his attorney represented both him and Marra; if he was aware that Marra might benefit in her federal prosecution from having her attorney representing him; and if he was aware that Marra could be called as a witness during his trial. The trial judge explained to Kopp that a potential conflict could arise if Marra were called as a witness against him at trial and asked Kopp whether he still desired to have Barket represent him. Petitioner answered affirmatively to all of the questions.

A written <u>Gomberg</u> waiver was also signed by Petitioner, reiterating the questions posed to Petitioner by the trial court in

---

[2]

The jury in the federal proceeding ultimately convicted Petitioner of both counts in the indictment, and the district court issued concurrent sentences, the longest of which was life in prison.

its oral inquiry. Petitioner reviewed the waiver with Barket, confirmed that he understood the waiver, and then signed it in open court.

On direct appeal, the Fourth Department rejected Kopp's claim that his attorney had an insurmountable conflict in representing both him and his co-conspirator:

> [W]e conclude that defendant knowingly chose to have defense counsel represent him after being fully apprised of the potential conflict and thus it cannot be said that defendant was denied effective assistance of counsel. The minutes of the comprehensive Gomberg inquiry undertaken by the court make clear that both defendant and his coconspirator had been apprised of all of the risks that could arise from their joint representation. Nonetheless, defendant insisted on moving forward with Barket as his attorney. Defendant continued that insistence during a subsequent hearing after Barket informed the court that he had not been allowed to represent defendant in federal proceedings. Accordingly, because defendant was advised "of the potential risks of continuing representation by defense counsel, and defendant [nonetheless] chose to have defense counsel continue to represent him[,] . . . it cannot be said that defendant was denied effective assistance of counsel[.]

People v. Kopp, 33 A.D.3d at 158 (internal quotations and citations omitted; ellipsis and alterations in original).

### d.   Analysis of the State Courts' Rulings

Petitioner now argues that Barket should have been disqualified from representing him in the state trial because the conflict of interest created by the simultaneous representation of Marra in the federal proceeding was actual, severe, and incapable of being waived. Petitioner argues that the district court's order disqualifying Barket from representing him should be held to apply

in this habeas proceeding. Ironically, in his 28 U.S.C. § 2255 motion to set aside the federal sentence, Petitioner argued, among other things, that Barket was wrongfully disqualified from representing Petitioner in the federal proceeding. In the state prosecution, however, Kopp was permitted to have his way and retain Barket. Their defense was unsuccessful, so now Kopp claims that Barket should have been disqualified because the conflict with Barket was actually unwaivable.

In light of Petitioner's unwavering insistence on retaining Barket as his attorney in state court and his decision to proceed without the assistance of counsel in federal court when he was not permitted to have Barket represent him, the Court finds his contrary protestations to be so disingenuous as to suggest bad faith. For purposes of this petition, Kopp's assertions are taken at face value. However, the district court's conclusion that Barket should have been disqualified from representing Kopp in the federal proceeding was made against a different factual background and therefore it cannot be imported into this proceeding.

The only "actual" conflict identified in the federal proceeding was with regard to Marra's potential plea deal, which she subsequently stated she was not interested in pursuing. In contrast to the federal proceeding, where both Marra and Kopp were charged separately, but remained inextricably connected, Marra was not being prosecuted on any state charges. Thus, there were no plea

negotiations in state court, for example, that could be jeopardized by Marra's testimony at Kopp's state trial.   The remaining conflicts noted by the district court were all "potential" conflicts, and all of them could have been waived, were it not for the exceedingly complex procedural and substantive nature of Marra's and Kopp's intertwined federal prosecutions. Those concerns were not present in the state court prosecution.

Even assuming arguendo that there was an "actual conflict" for Sixth Amendment purposes, see Mickens v. Taylor, 535 U.S. 162, 172 n. 5 (2002), the presumption of prejudice only applies if the defendant establishes that the actual conflict "adversely affected his lawyer's performance". Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). "Sullivan thus grants the defendant a 'limited[ ] presumption of prejudice.'" Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003)(quoting Strickland, 466 U.S. at 692). The Supreme Court has explained, in general terms, that the conflict must have an "adverse" and "significant[ ]" effect, Mickens, 535 U.S. at 172 n.5, but has not described the precise contours of the "lapse in representation," Cuyler v. Sullivan, 446 U.S. at 349. See, e.g., Burger v. Kemp, 483 U.S. 776, 785 (1987) (rejecting claim of actual conflict of interest because, inter alia, any conflict "did not harm [the allegedly conflicted] lawyer's advocacy").

Kopp has not demonstrated that "some plausible alternative defense strategy or tactic might have been pursued" which

"possessed sufficient substance to be a viable alternative" but "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Winkler v. Keane, 7 F.3d 304, 309 (2d Cir. 1993) (quotations omitted). Kopp has not cited any specifics as to how his representation by Barket was adversely affected apart from his unsubstantiated assertion that Barket "orchestrated" the confession to the newspaper. Thus, even assuming that there was an actual conflict-which the Court expressly does not find to have been the case-Kopp has not demonstrated his entitlement to the limited presumption of prejudice under Sullivan.

This Court shares the opinion of the Fourth Department and the trial court that the only conflict of interest was a potential one, which arose because the prosecution at Petitioner's state trial intended to call Marra as a witness. There was the possibility that Barket might not vigorously cross-examine a witness who also happened to be his client, because his ethical obligation as an attorney not to disclose his prior client's confidences and secrets might make hi cross-examination of the witness less effective than it might otherwise have been. See, e.g., United States v. Lussier, 71 F.3d 456, 462 (2d Cir. 1995). However, "lesser conflicts, such as an attorney's representation of two or more defendants or his prior representation of a trial witness, are generally waivable." Perez, 325 F.3d at 127 (citing United States v. Fulton, 5 F.3d 605,

613 (2d Cir. 1993)). Although such a conflict might require a defendant to abandon a particular defense or line of questioning, he can be advised as to what he must forgo. . . ." <u>Perez</u>, 325 F.3d at 127 (internal citations omitted). The conflict presented by the possibility of calling Marra as a witness was "only potential, not actual, and . . . involved the rather routine discrete problems that arise when counsel's loyalty is divided among multiple clients. Such conflicts can be knowingly and intelligently waived. . . ." <u>Id.</u> at 128.

As was his right to do, Kopp elected to waive the potential conflict of interest in order to retain the attorney of his choice. And, the record permits only one conclusion—that Petitioner's waiver was knowing, intelligent, voluntary, and was obtained after the trial judge exhaustively explained the ramifications of joint representation to him. <u>See</u> <u>Perez</u>, 325 F.3d at 127 ("In the multiple representation situation, the defendant can be advised by independent counsel . . . , and make a knowing and intelligent decision that he wishes to continue to be represented by his attorney despite the attorney's representation of another accused. Where the defendant can rationally opt to retain counsel of his choice despite a conflict, the court conducts a <u>Curcio</u> hearing[3] to determine whether the defendant knowingly and intelligently waives

---

[3]    <u>United States v. Curcio</u>, 680 F.2d 881, 888-90 (2d Cir. 1982).

his right to conflict-free representation.") (internal citations and quotations omitted).

The guidelines to be followed by trial judges in federal and New York state courts are similar. Compare United States v. Curcio, 680 F.2d at 888-90; with People v. Gomberg, 38 N.Y.2d at 313-14. A Curcio hearing is comprised of three parts. First, the court must "advise the defendant about potential conflicts"; second, the court "determine[s] whether the defendant understands the risks of those conflicts"; and third, the court must "give the defendant time to digest and contemplate the risks, with the aid of independent counsel if desired." Curcio, 680 F.2d at 888-90. At a Gomberg hearing, the trial court must "ascertain, on the record, whether each defendant (represented by the same attorney) has an awareness of the potential risks involved in that course and has knowingly chosen it." People v. Macerola, 47 N.Y.2d 257, 263 (N.Y, 1979) (quoting Gomberg, 38 N.Y.2d at 313-14 and citing Glasser v. United States, 315 U.S. 60, 70 (1942)).

Comparison of Curcio and Gomberg suggests that the Second Circuit imposes stricter guidelines on its trial courts than does the New York State Court of Appeals as far the procedure used in determining whether a defendant has made an informed decision to waive his counsel's potential conflict of interest. Nevertheless, there is no clearly established Supreme Court precedent holding that any specific "catechism" or procedural steps must be followed

by state trial courts when obtaining a defendant's waiver of counsel's potential conflict of interest. Gomberg, which requires the trial court to ascertain whether the defendant knowingly chooses to proceed with a potentially-conflicted attorney despite awareness of the risks involved, comports with the federal constitutional standard for waiving fundamental rights such as the right to conflict-free counsel.

Here, Kopp was thoroughly advised of the dangers arising from the particular conflict. The trial court fairly determined through questions that were answered in narrative form that Kopp understood the risks and freely chose to proceed, and that Kopp had had sufficient time to contemplate the risks after obtaining advice from independent counsel. Clearly, as Respondent argues, Petitioner proceeded with "eyes wide open" in electing to waive the potential conflict.

Even when a defendant waives his attorney's potential conflict of interest, he may still claim ineffective assistance of counsel if that waiver turns out to be detrimental to him at trial. Wheat v. United States, 486 U.S. 153, 161 (1988). Here, however, Petitioner eschewed a traditional jury trial in favor of a stipulated-fact bench trial. Marra did not testify and the conflict never materialized. Indeed, as a result of the procedural posture of Petitioner's trial, there was no conflict of interest–potential or actual–resulting from Barket's joint representation of Marra.

-15-

In sum, the trial court's and the Fourth Department's rulings were not an unreasonable determination of the facts in light of the evidence presented; nor did they reach a result contrary to, or amounting to an unreasonable application of, clearly established Supreme Court precedent.

### 2.    The Confession in *The Buffalo Evening News*

Petitioner next argues that he was deprived of the effective assistance of counsel because his attorney purportedly advised him to confess, in a November 12, 2002 article in *The Buffalo Evening News*, "that he planned the sniper shooting for a year, hid in the woods behind [Dr.] Slepian's Amherst home and fired the shot that killed the abortion provider." Lou Michel and Dan Herbeck, *Kopp Confesses: Tells News In Jail Interview That Outrage About Abortion Prompted Shooting Of Doctor*, THE BUFFALO NEWS, Nov. 20, 2002, at A1 <u>et</u> <u>seq.</u> (hereinafter referred to as "The Article"; page numbers cited will be from the record on appeal, i.e., "A__").[4] Petitioner argues that counsel urged him to confess in order to garner public support for the pro-life movement to which Petitioner is so fanatically devoted. As the Fourth Department concluded, "the interview made no sense from a legal perspective and led the People

---

[4] The newspaper article was reproduced at pages A44 to A51 of the appendix on direct appeal, and has been included in Volume I of Respondent's separately-bound, two-volume appendix of exhibits ("Exhibits-Volume I" and "Exhibits-Volume II"). Both volumes of exhibits, which contain copies of pertinent state court records, were submitted by Respondent to this Court on September 27, 2010, in connection with Respondent's Answer to the Petition.

to file a superseding indictment adding the count of depraved indifference murder." People v. Kopp, 33 A.D.3d at 158.

Although the interview was ill-advised, the record is devoid of any indication that it was Barket who induced Petitioner to speak to the newspaper. To the contrary, the article indicates that although "Barket encouraged Kopp to answer most of the questions posed to him, . . . [he] occasionally jumped in to caution Kopp, telling him at one point that he should not discuss the shootings of other doctors." The Article at A46. Reading the newspaper article, which is replete with direct quotations from Kopp, one is convinced that it was a publicity scheme concocted by Kopp. This comment is illustrative: "Kopp said he decided to make a public confession because he feels bad that his supporters have been misled, and he wants them to know the truth about his actions and the reasons behind them." Id. at A45.

The Court recognizes that the district court in its decision denying Petitioner's Section 2255 motion referred to Barket as having "arranged" Petitioner's interview with the newspaper. However, even if Barket facilitated contact between his client and the newspaper, it does not mean that he "orchestrated" or "instigated" the interview. As the Fourth Department found, "[t]here is nothing in the record on appeal indicating that it was Barket, and not defendant, who sought out the interview with the media and to the extent defendant contends otherwise, his

contention is based upon information outside the record and is thus not reviewable on direct appeal[.]" People v. Kopp, 33 A.D.3d at 158 (citations omitted). Moreover, in Kopp's subsequent motions to vacate the judgment of conviction pursuant to C.P.L. § 440.10, he failed to come forward with any support dehors the record for the proposition that he defense counsel had induced him to give a "confession" to the newspaper.

Although Petitioner, in his pro se supplemental brief to the Fourth Department, deemed the decision to talk to reporters "absurd," it arguably was rather a canny strategic move on Kopp's part to the extent that it enabled him to use the state trial as a forum to air his views on abortion and set the stage for his defense by telling the newspaper that he had only attempted to wound Dr. Slepian by shooting him in the shoulder and expressing shock that the victim had died. See The Article at, e.g., A44-A47. In the article, Petitioner stated that "'tried very hard' to only wound Slepian," and professed to have been "'horrified'" and "'saddened'" when he learned that the doctor had died. Kopp "insisted that 'any idiot' who studies the Slepian case could see that the shooting was not intended to be fatal." Id. at A46. The Article at A45, A46. Kopp told the reporters, "I made every effort possible to make sure Dr. Slepian would not die. It's the easiest

thing in the world to kill somebody with a rifle. You aim at the head or upper body."[5] The Article at A46.

Regardless of the wisdom of the decision from a purely legal perspective, the fact remains that it was a conscious, deliberate choice made by Petitioner. There is simply no basis to conclude that attorney Barket induced Petitioner to give his "confession" to the newspaper.

### 3.    The Erroneous Decision to Forego a Jury Trial

Petitioner contends that he was deprived of the effective assistance of counsel when he waived his right to a jury trial in favor of a stipulated-fact bench trial. The Fourth Department rejected Petitioner's unsubstantiated contention that "Barket pushed him for selfish reasons to stipulate to a trial on stipulated facts," finding that "the record clearly demonstrate[d] that it was defendant who wanted to pursue a stipulated-fact nonjury trial and did so knowingly, intelligently, and voluntarily, despite the warnings by the court and the court appointed attorney." People v. Kopp, 33 A.D.3d at 159 (citations omitted). This holding was supported by the record and a correct application of federal law.

---

[5]
    In fact, Petitioner did aim at Dr. Slepian's upper body, as the proof showed that the fatal bullet hit Dr. Slepian in the upper back; penetrated his left eighth rib, thoracic vertebral bone, spinal cord, right lung, right fifth rib, and right sixth ribs; and exited from the right underarm.

Prior to accepting Petitioner's proposal, the trial court assigned outside counsel, John R. Nuchereno, Esq. ("Nuchereno"), to discuss the ramifications of this decision with Petitioner. Discussions between Nuchereno and petitioner lasted approximately six hours, with Nuchereno strongly advising petitioner to not waive a jury trial in favor of the bench trial. After conferring with Petitioner, Nuchereno concluded that Petitioner could not be swayed from his decision on this matter.

On March 17, 2003, Petitioner appeared in court and waived his constitutional rights to a jury trial by executing both an oral waiver and a written waiver. During the colloquy, the trial court informed Petitioner that he was waiving his right to confront witnesses, the right to testify on his own behalf, and the right to have a jury of his peers decide his guilt or innocence. The trial court also asked Petitioner if he was aware of the ramifications of his decision, if he was voluntarily waiving a jury trial, and if he understood the differences between a jury trial and a stipulated-fact bench trial.

The written waiver was a four-page document which included a statement that Petitioner had not been pressured or coerced into electing to have a bench trial; that he was foregoing the opportunity to be convicted of a lesser included offense; that he understood what the penalties were for both the offense of second

degree murder and any lesser included offenses; and that it was a strategic matter to proceed with this type of trial.

It is settled that a criminal defendant may waive his constitutional right to trial by jury if the waiver is "knowing, voluntary, and intelligent." Patton v. United States, 281 U.S. 276, 312 (1930) (requiring "express and intelligent consent of the defendant" in order to waive a jury trial). However, a trial court "is not constitutionally required to conduct an on the record colloquy with a defendant prior to a waiver of the right to a jury trial." Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993) (citing United States v. Martin, 704 F.2d 267, 274 (6th Cir. 1983); United States v. Scott, 583 F.2d 362, 363-64 (7th Cir. 1978) (per curiam)). All that the federal Constitution requires is that a waiver of the right to a jury trial be knowing, voluntary, and intelligent. Id.

Viewing the record in light of these principles, the Court is not persuaded that Petitioner's waiver of his constitutional right to a jury trial was flawed in any way. The trial court took painstaking care to insure that Petitioner understood the constitutional rights he was waiving and that this was the course of action he wished to take. Petitioner consulted privately with outside counsel for six hours. The trial court even made an oral inquiry of outside counsel, attorney Nuchereno, to insure that Nuchereno fully understood the rights encompassed by the waiver

-21-

about which he was counseling Kopp. Finally, Kopp was extensively questioned by the trial court and was given ample time to review written waiver. Kopp, who possesses a master's level degree in biology, clearly was intelligent enough to comprehend fully what the waiver entailed. And, there is no indication in the record that Petitioner was incapable of articulately and independently expressing his wishes.

In sum, Kopp has offered nothing but his self-serving assertions that trial counsel's advice was professionally unreasonable. As discussed, above, the chronology of events strongly supports the inference that proceeding with a bench trial was Petitioner's strategy all along. Petitioner spoke to reporters and sought a stipulated-fact bench trial only after the trial court had denied several suppression motions brought by the defense concerning DNA and fingerprint evidence that establishing that Kopp was the shooter. It was only after the defense suffered these setbacks that Petitioner spoke to the newspaper. Petitioner's statements to the press set the stage for his eventual defense at the bench trial in which he admitted to shooting Dr. Slepian but denied that he had intentionally tried to murder him. Petitioner claimed that he only wanted to shoot Dr. Slepian in the shoulder to prevent him from administering more abortions and feigned "shock" at learning of Dr. Slepian's death.

In waiving a jury trial, Petitioner was able to present a defense of lack-of-intent without subjecting himself to cross-examination. Because it was part of the stipulated evidence, the trial court was required to consider Kopp's statement to the newspaper. Additionally, Petitioner was able to use the trial as a means of airing his anti-abortion views, something that would have been difficult, if not impossible, to do at a jury trial. Because the abortion issue was collateral, any testimony regarding it would have been deemed irrelevant and inadmissible by the trial court. Petitioner consciously opted for a method that would allow him to present otherwise inadmissible testimony (i.e., his anti-abortion opinions) while still being able to assert the legal defense of lack-of-intent.

### B.   Prosecutorial Misconduct

Kopp raises several meritless arguments in support of his contention that the prosecutor committed severe misconduct sufficient to deny him his right to a fundamentally fair trial. Petitioner contends that the prosecutor somehow exploited the alleged conflict of interest between him and his attorney-of-choice to introduce stipulated testimony containing prejudicial terms to describe the murder weapon. In particular, Petitioner takes issue with the use of the terms "assault rifle", "high powered rifle", "military" rifle, "full metal jacketed" bullets. He contends that these terms wrongly implied intent, and as a result, his conviction

was obtained in violation of his rights to a fair trial. In a similar vein, Petitioner contends that the prosecutor intentionally, and improperly, exaggerated the lethal effectiveness of the rifle used by him to murder Dr. Slepian so as to appeal to the jury's fears and sympathies.

Under New York State law and Federal law, prosecutorial misconduct must affect the fundamental fairness of the trial in order to warrant reversal. E.g., Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1974) (In order to overturn a conviction, the prosecutor's comments must constitute more than mere trial error and instead must be so egregious as to violate the petitioner's due process rights). In determining whether a prosecutor's misstatements "so infected the trial with unfairness as to make the resulting conviction a denial of due process," the Second Circuit has instructed reviewing courts to consider various factors such as the severity of the misconduct, the sufficiency of any curative judicial instructions, and the likelihood that the misconduct affected the outcome of the case. Agard v. Portuondo, 117 F.3d 696, 713 (2d Cir. 1997), rev'd on other grounds, 529 U.S. 61 (2000); see also United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) (per curiam). For the reasons that follow, the Court concludes Kopp's claim is plainly meritless as he has entirely failed to demonstrate any improprieties in the prosecutor's conduct.

As an initial matter, the Court concludes that the prosecutor did not misstate or mischaracterize the evidence. The terms "high powered" rifle, "military" rifle, "assault" rifle, and "full metal jacketed" bullets by the prosecutor were not improper, given that Petitioner used a Soviet-made SKS semi-automatic rifle and "full metal jacketed 7.62 × 39 mm bullets to shoot and kill Dr. Slepian. See Stipulation of Facts dated March 17, 2003 ("Stipulation"), at p. 27, A114.[6] This type of rifle and this type of bullets, "based on their design and construction, [are] considered in the firearms' field as reliable components for accurate shooting." Id. at 27, A114. Firearms/ballistics expert Michael Dujanovich opined that the bullet would have been traveling at a velocity of approximately 2000 feet per second at the time it struck Dr. Slepian. See Stipulation at p. 6, A93. According to Vincent DiMaio, M.D., a forensic pathologist, the 7.62 × 39 mm full metal jacketed bullet used by Kopp was "a military bullet designed to punch holes in material as well as in people and was not significantly deflected" once it entered Dr. Slepian's body. Stipulation at p.35, A122.

Even assuming for the sake of argument that the use of these terms was improper, it is unlikely that they had any effect on the trier-of-fact's determination that Kopp acted with intent. Regardless of how the murder weapon was characterized, the proof as

---

[6]

The Stipulation is contained in Volume II of the Exhibits, submitted by Respondent to this Court on September 27, 2010, in connection with Respondent's Answer to the Petition.

to Petitioner's intent was overwhelming and thus, even if the challenged statements were improper, they were harmless. See Modica, 663 F.2d at 1181 (noting that "the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal").

The prosecution was able to, and did establish, Kopp's manifest intent to kill Dr. Slepian solely by reference to Kopp's actions: stalking Dr. Slepian as if he were prey to be hunted; setting up a sniper post outside his house from which he could see Dr. Slepian through the kitchen window; aiming at Dr. Slepian through the sniper-scope on his semi-automatic SKS rifle, pulling the trigger of the rifle; and causing the discharge of one fatal bullet which penetrated Dr. Slepian's left chest wall, left eighth rib, thoracic vertebral bone, spinal cord, right lung, right fifth rib, and right sixth ribs, and exited his body from the right underarm. In light of this evidence, the make, model, classification, and description of the gun were of little to no significance. Petitioner's actions-regardless of the type of gun used, or how the prosecutor characterized the gun-demonstrated his intent to kill beyond all reasonable doubt.

**C.   Erroneous Introduction of Evidence**

Petitioner also claims that a visual aid used at the trial, a photograph depicting his view of the Slepian's house before the shooting allegedly omitted a view of the victim's head from Petitioner's vantage point. Petitioner relatedly contends that the photograph was fraudulently staged by the prosecutor and was inaccurate. Petitioner reasons that because the photograph reconstructing his view from his sniper's post was "the only evidence which could have possibly gone to prove intent," his conviction was based on erroneous, prejudicial evidence and thereby violated due process.

Federal habeas corpus relief is not available for mere errors of state evidentiary law. Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (citations omitted). Here, Petitioner has offered no evidence beyond his own unsubstantiated assertion that the photograph was doctored. He has demonstrated no error of state evidentiary law, much less any misconduct on the part of the prosecutor in presenting evidence which, incidentally, Kopp and Barket explicitly agreed to include as part of the record. This claim is specious and must be summarily dismissed.

**D.   The Alleged Violation of the Specialty Doctrine**

Petitioner claims that his conviction should be vacated because the extradition treaty between the United States and France was purportedly violated when the prosecution sought a superceding

indictment against him including a charge of depraved indifference murder based upon his confession in the Buffalo newspaper. Petitioner also contends that the 1970 extradition treaty was still in effect at the time of his extradition and that the 1996 extradition treaty was inapplicable.

Respondent concedes the 1996 treaty was not in force until after February 1, 2002, but nevertheless asserts that by the time the extradition order was issued on February 19, 2002, the 1996 treaty was in effect. Petitioner argues that the 1970 treaty applies because the extradition request was submitted to France long before February 1, 2002.

Unlike the 1970 treaty, the 1996 extradition treaty between France and the United States contains a clause codifying the doctrine of specialty. The specialty doctrine reflects a fundamental concern of nations that persons who are surrendered via extradition should not be subjected to indiscriminate prosecution by the receiving government. Fiocconi v. Attorney Gen'l of the U.S., 462 F.2d 475, 481 (2d Cir.), cert. denied, 409 U.S. 1059 (1972). Underlying the doctrine of specialty is the theory that the requesting nation should not be able to prosecute a person for crimes that are not listed under the treaty. Id. at 481; see also United States v. Rauscher, 119 U.S. 407, 424 (1886).

The only pertinent difference between the 1970 treaty and the 1996 treaty appears to be that the 1996 treaty specifically

-28-

included a clause codifying the well-established common law
doctrine of specialty. Kopp appears to be arguing that because the
1970 treaty did not have a specific "specialty" clause, the
principles underlying the specialty doctrine did not apply to his
case. Kopp cites no legal support for this proposition. The Fourth
Department correctly applied federal law in concluding that the
doctrine of specialty was not offended based upon the particular
facts of Kopp's case.

On direct appeal, the Fourth Department noted that the federal
courts which have addressed the issue are divided with respect to
whether a defendant, as opposed to the country from which he was
extradited, has standing personally to invoke the specialty
doctrine. People v. Kopp, 33 A.D.3d at 157 (citations omitted). For
purposes of the appeal, the Fourth Department assumed, arguendo,
that Kopp had standing. However, the Fourth Department noted,
"[t]he rule of specialty is only violated . . . if a superseding
indictment charges new 'separate offenses' against the defendant."
People v. Kopp, 33 A.D.3d at 157 (quotation omitted). In Kopp's
case, the additional charge contained in the superseding indictment
(depraved indifference murder) was based upon the same set of facts
and contained the same statutory crime, murder in the second
degree, as the charge upon which Kopp was extradited (intentional
murder). Id. Therefore, the Fourth Department concluded, the
additional charge of depraved indifference murder was not a

"'separate offense[] within the purview of the doctrine of specialty[.]'" Id. (quoting United States v. Sturtz, 648 F. Supp. at 819 (S.D.N.Y. 1986) ("A superseding indictment which charges offenses of the same character as the crime for which the fugitive was extradited does not offend the doctrine.") (citing United States v. Rossi, 545 F.2d 814, 815 (2d Cir. 1976), cert. denied, 430 U.S. 907 (1977)).

Moreover, this claim does not present a cognizable basis for habeas relief, regardless of which treaty applies. The essence of Kopp's argument is that the superseding indictment containing the depraved indifference murder charge was impermissible. Errors in an indictment generally do not provide a basis for federal habeas relief. See Edwards v. Mazzuca, No. 00-CV-2290, 2007 WL 2994449, at *5 (S.D.N.Y. Oct. 15, 2007) ("Challenges to state indictments will merit habeas corpus relief only in the exceptional case where the indictment fails to satisfy the basic due process requirements: notice of the time, place, and essential elements of the crime.") (internal quotation marks omitted). Most importantly, Kopp suffered no prejudice as the result of the superseding indictment adding the depraved indifference charge, since he was acquitted of that charge after the bench trial.

## E.  The Alleged Absence of a "Prosecution" for Double Jeopardy Purposes

Petitioner claims that he never was "prosecuted pursuant to NY Criminal Procedure Law . . . for the offenses he has been sentenced

for, in that no witnesses were ever sworn at his 'trial' and thus, under both New York State and federal law, jeopardy never attached." Petitioner's Reply Memorandum of Law ("Pet'r Reply Mem.") at 8. Although Respondent has contended this claim is unexhausted, Petitioner has submitted documentation establishing that it was raised on direct appeal to both the Fourth Department and the Court of Appeals by Petitioner in his pro se supplemental brief. The Court concludes that it has been properly exhausted, see 28 U.S.C. § 2254(b)(1), but that it, nevertheless, does not provide a basis for habeas relief.

Petitioner's Double Jeopardy claim was included among Petitioner's "remaining contentions" that the Fourth Department summarily denied on direct appeal as "without merit." People v. Kopp, 33 A.D.3d at 160. The Fourth Department did not incorrectly apply federal law in so holding.

Petitioner claims that he has "presented New York State authority and controlling authority from the Supreme Court demonstrating that jeopardy does not attach in a bench trial prior to the swearing of the first witness." Pet'r Reply Mem. at 9 (citing Willhauck v. Flanagan, 448 U.S. 1323, 1326 (1981) (opn. in chambers by Brennan, J.). Petitioner reasons that because there were no witnesses called at his trial, jeopardy never attached. And if "if jeopardy has never attached, there has been no 'prosecution' such as would preclude a further prosecution under principles of

double jeopardy, and equally no 'prosecution' which could legally result in the imposition of punishment." Id. Petitioner's argument, albeit creative, is entirely without merit.

The Double Jeopardy Clause of the Fifth Amendment provides "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V; see also Benton v. Maryland, 395 U.S. 784, 784-85(1969) (holding that the Double Jeopardy Clause was incorporated against the states by way of the Due Process Clause of the Fourteenth Amendment). In a jury trial, jeopardy attaches once the jury has been empaneled and sworn, even though no evidence relating to the defendant's guilt or innocence has been introduced. Illinois v. Somerville, 410 U.S. 458, 466 (1973) (citing Downum v. United States, 372 U.S. 734, 735-37 (1963)).

In a nonjury trial (such as Petitioner's), Double Jeopardy does not attach until the court begins to hear evidence from which a factual determination of guilt or innocence can be made. Serfass v. United States, 420 U.S. 377, 388 (1975) ("In a nonjury trial, jeopardy attaches when the court begins to hear evidence.") (citing McCarthy v. Zerbst, 85 F.2d 640, 642 (10th Cir.), cert. denied, 299 U.S. 610 (1936); Wade v. Hunter, 336 U.S. 684, 688 (1949)). "Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes

double jeopardy." <u>United States v. Marchese</u>, 46 F.3d 1020, 1022 (10th Cir. 1995) (quotation omitted.).

In a typical nonjury trial, the judge begins to hear evidence when the first witness is sworn. <u>Crist v. Bretz</u>, 437 U.S. 28, 37-38 (1978). Petitioner's trial, however, was not a "typical" nonjury trial because no witnesses were ever sworn; all of the evidence was presented by way of a document containing stipulated facts. Under these circumstances, where the parties agree to stipulated facts, federal courts have held that the mere submission of the stipulation of facts to the court constitutes the hearing of evidence, thereby causing Double Jeopardy to attach. <u>See</u> <u>Gooding v. Stotts</u>, 54 F.3d 787 (Table), 1995 WL 307566, at *10 (10th Cir. May 11, 1995). In <u>Gooding</u>, the state trial judge received the parties' evidentiary stipulation in open court, but refused to accept it, stating, "I don't think it's legally sufficient to establish a <u>prima facie</u> case." Defense counsel then moved for a judgment of acquittal, but the court denied the motion. Several days later, the parties presented the state trial judge with a second stipulation of facts, which the court accepted and from which it proceeded to find Gooding guilty of possession of cocaine as charged.

Gooding ultimately obtained habeas relief on the basis that Double Jeopardy had attached at the time the first, albeit insufficient, factual stipulation had been submitted to-but not

accepted by the trial court. The Tenth Circuit reasoned that because the stipulation of facts "undoubtedly" gave the court "the power to determine the guilt or innocence of the defendant"; the state court's ruling was related to the factual stipulation itself; and the parties in that case "expect[ed] that the stipulations of fact would place the defendant in jeopardy," the first stipulated fact trial resulted in an acquittal after jeopardy had attached upon the submission of the stipulated facts to the trial court for it to determine Gooding's guilt or innocence Id. at *10-11(citing United States v. Finch, 548 F.2d 822, 825 (9th Cir. 1976)).

In Kopp's case, there is an even stronger basis for finding that Double Jeopardy attached, since the stipulated facts were formally accepted into evidence by the trial court and actually relied upon by the court to reach a verdict of guilty. See United States v. Hill, 473 F.2d 759, 761 (9th Cir. 1976) (holding that Double Jeopardy attached in cases where the defendants had been arraigned on valid indictments and had pled not guilty; the court had received stipulated facts into evidence; the defense submitted a motion to dismiss on the basis that the mailed matter was not obscene, a necessary element of the offense; and the having considered the evidence, the court ruled, "as a matter of law," that the matter was not obscene). Without a doubt, in Kopp's case, the trial court "heard evidence"-the functional equivalent, for Double Jeopardy purposes-of having the first witness sworn. See

-34-

Hill, 473 F.2d at 761 ("Surely, a court is 'hearing' the evidence just as much when it receives written evidence as when it hears oral testimony of a witness. Many cases are tried solely on written evidence, sometimes on a stipulation of facts, sometimes on a transcript of a preliminary hearing or of a preliminary motion, such as a motion to suppress, sometimes upon evidentiary exhibits alone. . . . We have held that a trial of this type places the defendant in jeopardy.") (citation omitted). Kopp's argument attempts to elevate form over substance but in the Double Jeopardy context, "it is substance, not form, that governs." Hill, 473 F.3d at 763; see also Serfass, 420 U.S. at 390 (noting that it has expressly "disparaged 'rigid, mechanical' rules in the interpretation of the Double Jeopardy Clause")(quoting Somerville, 410 U.S. at 467).

**V.    Conclusion**

For the reasons stated above, the Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition is dismissed.  Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

                                    **S/Michael A. Telesca**

                        _____
                             MICHAEL A. TELESCA
                        United States District Judge

DATED:      September 16, 2011
            Rochester, New York